Ms. Gauthier, when you're ready. Good afternoon, may it please the Court, Camille Gauthier on behalf of the Appellant, Gray Group Investments, LLC. One primary question begins and ends this appeal. Did the Great Lakes Policy clearly and unambiguously identify the hurricane questionnaire beyond all reasonable doubt to incorporate the questionnaire into the policy? The answer to that question, as I'll discuss in further detail this afternoon, is no. The District Court erred in holding otherwise, which led it to wrongly deny Gray Group's Rule 12c motion for judgment on the pleadings. This Court should reverse. Gray Group insured its $1.9 million vessel under a Great Lakes Policy, and when the vessel was destroyed, Great Lakes immediately denied coverage because Gray Group supposedly breached a vessel location warranty found in a hurricane questionnaire that Great Lakes contends was supposedly incorporated by reference into the policy. Does the record show that the vessel was never in New Orleans during the July to October period? You are right, Your Honor, that that is what the record shows, and, of course, the first threshold question before we would even reach that is whether that hurricane questionnaire is even a part of the policy at all, and it is not. And I'll discuss further the sort of vessel location provision in a moment, but the threshold question where we wouldn't even consider where the vessel was is that the questionnaire is not even a part of the policy. Well, let's get to the threshold question. Clearly, the policy incorporated something, correct? It did, Your Honor. The application form. It mentions the application form. It also says the full application for insurance is incorporated. It does, Your Honor. So clearly something is incorporated. Some things are incorporated. The application form actually says application form on top of it. That seems to be a direct correlation with the first term. So what about the second term? The full application for insurance? Yes, Your Honor. So first of all, you are right. The policy does incorporate that five-page application document. We agree on that. The first reference is to the application form. It says the insuring agreement incorporates the application form. The second reference you mentioned also says what the insuring agreement incorporates, and there it uses the phrase application for insurance. Those two things, similarly worded, need to be read in a compatible manner. Why? They're not the same. They're both referring to what constitutes the insuring agreement. So we'd be creating an unnecessary conflict to say on the one hand the insuring agreement incorporates the application form, and on the other hand to say the insuring agreement incorporates something different when it uses the phrase application. And I'll also— It says the full application for insurance. It does, Your Honor. So why would they use different terminology if it was the same document? Well, Your Honor, let me point you to the five-page application document itself. That document literally calls itself—it's titled application form, and then it calls itself this application and this application for insurance. That phrase, application for insurance, is the one that you're referencing in the policy. And so that's record 190, where the application form itself calls itself the application for insurance. So you're right that the policy uses two different terms. So does the application form document. It calls itself by those different names, all meaning the exact same thing. Can there be a clear intent to incorporate a document, but an unclear intent to incorporate or what that specific incorporation is? In other words, clearly the policy incorporates the full application for insurance. Can there be under New York law, then, ambiguity about what exactly that is? Well, Your Honor, I'm glad you asked that question. New York law is clear that a document has to be identified clearly and unambiguously beyond all reasonable doubt. But in New York law, also, clearly there are cases where fact issues or extrinsic evidence is resorted to to determine what's been incorporated. So, first of all, I don't believe there are cases that would allow us to look to extrinsic evidence. You are right that Great Lakes cited two older cases, lower New York state court cases, that do reference it being a fact question. And I would submit those are sort of irreconcilable outlier, older outdated questions, outdated questions. Is it law? Well, Your Honor, we've cited much more recent multiple cases within the last few years that literally say whether a document is incorporated by reference is a question of law. And so the fact that the more recent cases tell us it's a question of law, and of course this is 12C, this is a policy that's in the record, so of course it's appropriate for this court to interpret that policy interpretation question on a 12C. Oh, but that's why I asked the initial question of whether there was a difference between clear intent to incorporate, it is clearly and unambiguously incorporating something in the policy, versus resorting to extrinsic evidence to determine exactly what is incorporated. That seems to be how to harmonize the New York case law. I see. Well, Your Honor, again, a document's got to be clearly and unambiguously identified beyond all reasonable doubt. And I think the way that you do that is by referring to the document by name. The policy here refers to the application document, the application form, by name. Sure, but it refers to something different when it says full application for insurance. Well, again, the— Or perhaps there's an ambiguity to what it's referring to, but there again, can we not resort to extrinsic evidence consistent with New York law? Well, Your Honor, if there is any ambiguity whatsoever, and of course we submit that it's unambiguously referring to the five-page application document. If there is any ambiguity, which is what the district court stated, then we know that the document was not clearly and unambiguously identified beyond all reasonable doubt. If it could mean one thing or if it could mean another thing, by definition, you have not met the test under New York law. It's got to be beyond— That's a strong statement, but where in New York law does it say that lack of ambiguity is a necessary condition for incorporation? In other words, I would have thought that you look at a contract and if it refers to something, the concern under New York law is did the parties have fair notice, right? So we want to know for sure that the parties agreed about a specific identifiable document. That's the logic behind this. So if there's ambiguity caused by two slight discrepant terms, I would think then you would go to extrinsic evidence, the exchanges, the email exchanges, Mr. Crews' statement, actually the hurricane plan itself saying that it is incorporated. So then we know beyond a reasonable doubt the parties intended that this particular document was essential and incorporated. What's wrong in that analysis of New York law? Your Honor, New York law and the way it's framed in the cases says the document's got to be clearly and unambiguously identified beyond all reasonable doubt. And New York law makes the wise policy decision to require it to be within the four corners of the policy itself, what it is referring to. I would have said we know without a doubt something's being incorporated. There may be or there may not, that's disputed, ambiguity as to what that is because there are these two odd descriptors. So therefore we go to extrinsic evidence and at that point we know beyond a reasonable doubt that everyone thought the hurricane voucher warranty was going to be part of getting insurance. Why doesn't it work like that? Well, Your Honor, a couple of things. Again, we already know from the five-page application document that it calls itself the application form, it calls itself this application, it calls itself application for insurance. Does it call itself the full application for insurance? It doesn't call itself the full application for insurance, but when the phraseology in full is used there, it's discussing how that five-page application document is incorporated. When you look at that document, for example, the policy, I'm sure you know it much better than I do, the exclusion A says if there's going to be damage when you're transporting this boat, we don't cover it if it's beyond 250 miles from its place of storage. That's the policy exclusion. But what it specifically says is from the normal place of storage as disclosed within your application form. So there again is the clear, unambiguous, known disputes incorporation of the application form. But I didn't see anywhere in that form a normal place of storage. Do you? Did you? No, Your Honor. I mean, I guess that particular reference that you're referring to is not something that's sort of at issue in appeal, but it is... It isn't specifically at issue, but it does stand for the proposition that everything that Mr. Cruz or whoever it was that signed the full application on the 11th would be part of the full application. That's right. The hurricane warranty is by far the most important one to the insurer, but it's possible we also need to know when it's going to be stored on the land, where is it going to be stored. Well, Your Honor, you say the hurricane warranty is the most important sort of thing to the insurer. It would be very easy, and it's indeed possible for Great Lakes to just simply clearly and unambiguously identify that document by name in the policy. No one's suggesting that they couldn't do that. They didn't do that here, and New York law wants it to be so that all we have to do, and this is in favor of both parties, you should be able to look at the policy itself, the agreement itself. I agree. Now, watching your clock, because we've gone over this, if we decide that incorporation did occur of the hurricane warranty, do you lose or do you think that there's district court error as to there being no dispute of fact as to your breach of that document? Do you understand my question? Yes, Your Honor. So if we're assuming that the hurricane questionnaire is incorporated in part of the policy, and then we were to reach the question of the vessel location provision, the district court erred on that, and that is because a policy warranty, the vessel location language, that has got to be strictly construed in favor of the insured. It's got to be specific and clear, and the insurer must prove that its construction is the only fair one. And that hurricane questionnaire simply asked the question, name, address, and contact details of marina where vessel is located between July 1st and November 1st. Language asking for the vessel's address does not specifically and clearly require or obligate any obligation to spend a certain percentage of time or certain amount of days in that location. And as an example, in contrast, the policy itself, the declarations page, does have a it. Vessel is not to navigate south of the Tropic of Cancer July 1st to November 1st. If Great Lakes intended to require the vessel to be moored at a specific location for a certain amount of time, it could have written that in. It could have imposed in specific and clear language, but it didn't do so. And the district court even acknowledged that the vessel location question was ambiguous and susceptible to multiple meanings. But it rejected... Again, if it's ambiguous, it's as to whether always or sometimes. And this was never. So either way, it would, if it controls, then there's violation. Your Honor, I disagree with that because, so first of all, we're assuming the hurricane questionnaire is incorporated, and it's not. But if we assume that it were, in order for a warranty to be enforceable, it's got to be specific and clear, and the insurer's interpretation must be the only fair one. And because it's not written in a specific and clear way, and because their interpretation is not the only fair one... Is there any way to interpret that as spending no time from July 1 to October? Well, Your Honor, Gray Group's interpretation was that that was asking for the home port, the default location, what's the vessel's address when it is not otherwise in use in accordance with its navigational limits. And that answer was accurate. It leases space. It has a slip space in the Orleans Marina, and that is where the vessel is kept. But it wasn't navigating at the time that it sank. You're correct, Your Honor. And what is it, question four on that hurricane warranty, where it says, when a storm is within this many hours, you've got to be, what's the word used, docked at Orleans Marina? Your Honor, I guess I'm not sure specifically what language or question you're referring to. It's the hurricane. It's not the first one, which is where are you located. It's the four, please provide your plan for protecting the vessel, and then the statement is between 120 and 72 hours before landfall of the hurricane, I think it basically says it's going to be docked at Orleans Marina, and then if the storm comes right there, it's going to go east, northwest. Sure. So, Your Honor, a few points on that. So, first and foremost, the district court did not reach sort of the response and its actions that you quoted there from the hurricane plan, so that's something that wasn't even reached. But doesn't that inform what the locational answer is to question one that they say was breached? Well, Your Honor, you'll also note that in that written out plan, it also talks about what would be done if the vessel was in South Florida, for example. Right, but it left South Florida to go to Pensacola, so that if, had it been down in South Florida, there's a provision for that. They left, right? They left from that exact location to go drop anchor off Pensacola. They did, Your Honor, in anticipation of future trips within the navigational limits. And so, I'll close and just note that the whole point is that the vessel location question was not specific and clear, and it does not alert and ensure to understand what obligation, if any, it is undertaking to spend a certain amount of time, a percentage of time, in that location, and therefore, it's not enforceable. You've got your full rebuttal. Thank you. Thank you. Mr. Crawford? Good afternoon. May it please the Court, I'm Todd Crawford for Great Lakes Insurance. I think we've been discussing, you all have been discussing pretty clearly the issues in the case. At its core, this is a case about a sophisticated commercial entity that owned a 65-foot yacht that applied for insurance with my client, Great Lakes. Great Lakes asked them, what is your plan in the event of a hurricane? They said, we'll do these four things. They did none of those four things. Well, the breach, the only breach that's before us is, did they breach the answer to question one of the hurricane warranty that you drafted, which says, where are you located? It's hard for me to harmonize that with, they clearly didn't mean to warranty they would never sail the boat for months and months. Let me address that first. The first premise that you said, which is the only issue before you, with respect, any of the issues that we briefed and that were put before the district court, you can affirm on that basis. So, they not only breached question one, where will this vessel be during hurricane season July 1 to November 1. They also failed to fully man the vessel 72 hours ahead of time. The only issue the district court reached was, was the breach of point, I think, was the breach of the answer to question one. That is correct. And she very specifically, Judge Vance very specifically said she did not reach the other issues. I just want to make sure I make clear my position is not that you're limited to that, which is what counsel's position was. And to be honest, your honor, it's much easier. We know they didn't evacuate the vessel. The vessel wasn't moved. They said they would have it fully manned. They said they would evacuate. But now you're jumping to other issues. So let's just focus on, is it susceptible to no other reading? In other words, no triable issue, no dispute of fact, that when you say, here's the address of the boat, that means somehow between July and November, it's never going to move from Orleans Marina? They never took that position, your honor. They've created a paper tiger on that. That seems like a big issue, at least as to what the district court ruled on. And to be fair, what the district court ultimately determined was, and Judge Wieners observed, this vessel, we ultimately learned, and they hid it from us for a very long time, was never in the New Orleans Marina throughout the entirety of it. So we could have an issue of, is it this, is it sometimes, always, or a little bit, but it was never there. But if we don't know what the provision really asked for, I mean, it may just be, where was the boat registered? You know? Well, you could look at the actual provision and the actual question on the form itself. I don't have the form presently in front of me, but there is a precise question, where will the vessel be between these two dates? And if you don't have an address, give us the longitude and latitude. I know it says that. Where is the vessel located between the first of July and the first of November? And then, by not having it there for those, whatever, five months, but how does that harmonize with them being able to navigate anywhere except south of the Tropic of Cancer? Well, Your Honor . . . Because I know the district court gave a very plausible, logical answer, which is, no, it just meant that they'd be there the majority of the time. But how do we know . . . that sounds like a debatable . . . Well, then ultimately, Your Honor, what did the district court do? She ultimately found that that was an ambiguous issue. That's what she found. I don't agree with it. But we always maintained that it was only a majority of the time. Counsel is misrepresenting what our contentions were in that respect. We said, look, why is the vessel in Pensacola? We don't know anything about Pensacola. We don't know why it's in Pensacola. Would you please tell us why it's in Pensacola? How long has it been Pensacola? How did it get to Pensacola? They wouldn't tell us those things. We had to go . . . Okay, so if you were writing the decision, you would affirm saying what? The district court's correct, or there's a . . . I would say the district court was correct. There's no dispute of fact as to what location means. Even though the application form is clear, they're allowed to navigate all over the northern hemisphere. That's true. But that means they're not located. If they were navigating, we could have that argument. And if they were navigating not into the heat of a storm, you're not going to take your vessel and go navigate it straight into the middle of the hurricane. What their intent was, what they said in the hurricane plan is, we will evacuate to the west, to the north, or to the east. And this vessel will be fully manned and capable of moving up to 2,000 nautical miles. That's in their plan. If necessary, we can move 2,000 miles out of the way, nautical miles. So we're talking about . . . They didn't move at all. Remind me, counsel, where's the hurricane plan appended in this constellation of documents? We've got the policy, we've got the application form. That's correct. We've got the full application for insurance. We'll set that aside for a minute. But I imagine your position is that includes the hurricane questionnaire. So of the application form, the policy, and the hurricane questionnaire, where does the hurricane plan fit in?  It's an addendum to the hurricane questionnaire, Your Honor. So it's in the hurricane . . . The question four says, what is your plan, and then they say, see attached, and it's all in one. All right. So if I remember right, I was asking earlier about the location or the residence provision that the hurricane questionnaire asks, where's the boat located? Yes. If I remember right, the application form asks something about where's it moored most of the time during . . . Primary mooring location. Primary mooring location. During the same time period. The hurricane season. And they said the exact same thing. And that was the very . . . But my point is . . . Yes. That question, the primary mooring location, is clearly differently phrased than the question on the hurricane questionnaire, which is, where's it primarily located? And I mean, I guess to the extent there's any distinction there, I kind of want to explore that a little bit because, I mean, from Gray Group's perspective, they're filling out the questions on both of these things. So it asks for something different. And when we're trying to get to the meaning of the question on the hurricane questionnaire, what is the import that the application form asks a different question, if any? Well, Your Honor, I will say this, and I will circle back to what Judge Vance did. She made a determination, as the court has suggested today, I don't know what it means. She then looked . . . Based on the hurricane questionnaire . . . Based on the hurricane questionnaire language . . . She didn't look at the application. And then she went through and said, I'm going to look to extrinsic evidence. The extrinsic evidence shows, and there are emails between the parties, brokers, and so forth, showing we rate on the basis of where the vessel is for the majority of the time. If you're going to . . . You already have, and the emails say this, to this effect. You have permission to go to Florida, but if you're going to stay in Florida for more than two months, for more than half of the time, then you need to let us know and we'll give you an additional premium. And all of that is very plainly exchanged in the documents. In the extrinsic evidence. In the extrinsic evidence. So I want to talk about that issue very briefly, and that is, they point to Lend Energy, and they say this is controlling on the incorporation of documents doctrine. And what I want to point out to the court is Lend Energy did not involve a case where the court determined that there was an ambiguity. Similarly, all of the cases they cite on page 26 of their brief did not involve a case that dealt with ambiguity. And they have not cited you to a single case that says where there's ambiguity as to what's incorporated that the court doesn't follow the same general rules of New York law that are described on page 40 and 41 of my brief. Is that what I was describing? If ambiguity, look at extrinsic evidence to decide party's intent, identify. But there is New York law that says, say, the incorporation doctrine is a question of fact. Well, Your Honor, we cite to two cases on that issue. But if it is, isn't there, isn't this an issue for, pardon me? You literally go to trial. Those are the two. Right. But why wouldn't that be the answer here, then, if it's debatable whether we. Well, because the court determined, and I think you can determine and to be in all honesty, the Gray Group presented no evidence, zero in connection with their motion for summary judgment and no evidence in opposition to our motion for summary judgment. There is literally no evidence to create a material issue of fact. We presented the evidence. You mean as to everyone expected this hurricane plan to be incorporated? All of those, all of the extrinsic evidence, if you will, is all one sided. Of course, they don't have to present extrinsic evidence if their reading on New York law is right, that if there's an ambiguity into what's incorporated, they win, you lose. Well, you know, and I'll say that they're taking, I take issue with the way that they phrased it, Your Honor, because there's, you know, ultimately the test is, and if you look at page 16 of their brief, it's beyond all reasonable doubt. And what they're trying to say today is it's beyond all doubt, right? So the parties, the whole idea here is, are you on notice that something is incorporated? Yes. We know something is incorporated if, triple underline if, we ignore the difference in the language to the point that Judge Wilson discussed earlier, and we just assume there's an ambiguity, how do we resolve that ambiguity? We go to extrinsic evidence. You're saying there's no New York case that says lack of ambiguity is a necessary condition for incorporation. You said there's no case. That's, they don't cite you to any case. That's correct. And you haven't found one. And the two cases that I did cite, Kenner v. Avis Rent-a-Car, and I'm going to butcher this name, I'm calling it Chichia v. National Westminster Bank, USA. Those are the two that they said, look, if there is a factual question as to whether something was incorporated or not, you have a trial, okay? You don't, so, but their position is, if there's a factual question, then you just throw the baby out with the bathwater, and we just ignore it all together. But what would the purpose of that document be if it's not incorporated? Precisely, Your Honor. The whole thing, the whole reason, and I realize this is extrinsic evidence, so I'll be very clear, but all of the emails and so on and so forth, this policy was not only threatened to be canceled, it was canceled because we didn't receive a hurricane plan. We said, look, we have these outstanding items, okay, we've, we've, I don't know the correct word, but we've issued a binder, but, you know, premised on the idea that we're going to get these documents in, and we haven't gotten these documents, and you've got 15 days. Okay, you've got five, I may not be exactly 15 days, but that's the general idea. And then they had one where they let it go, and they literally didn't send the documents in, and they said, hey, this policy was canceled two days ago. Retrospect, retroactive to day one, boom, within hours, oh, here came the hurricane plan, right? So there's no question, you cannot get an insurance policy from Great Lakes Insurance without submitting a hurricane plan, and the evidence in this case that was submitted and considered by the district court demonstrates that, demonstrates that it was, in fact, canceled repeatedly. Or at least, it was canceled once and threatened to be canceled two other occasions. That does, but that still just gets us back to that second question, which is, okay, if the plan's incorporated, is there no dispute of fact as to whether they breached the language which says address and location for months and months? Well, they didn't, it wasn't there at all. That's step one. And then step two, it wasn't there at all, but what's your authority that that means no triable issue, right? It doesn't necessarily mean they breached that first location, that could just be an address where it is. Your Honor, the question is, is where is it going to be during this time frame when it's not there at all? It wasn't, it wasn't there for a minute, not for a second. Would you say it was navigating? No, sir. It was not navigating. It was moored behind the house. In fact, what actually had happened— Part of my difficulty is the application form and the hurricane plan have so many different yachts and boats, moored, stored, secured, resides, located, docked. And are you saying they were in violation of promises they made as to all that they would be—all those places were, I guess, Orleans Marina in your mind? That's where they listed that the vessel would be during hurricane season. Would be, okay, during hurricane season. During hurricane season from July 1 to—the question, both in the application form, which Everybody admits it's incorporated, by the way. And it very clearly says primary mooring location. So I will say this. They are correct. The district court said I couldn't make that argument because we didn't have it in our complaint. We didn't have it in our complaint because the incident happened September 16. We filed the suit on October 13. On October 13, they wouldn't tell us why the vessel was in Pensacola, how long it had been there, etc. We don't find that out until a year later and we're filing a—we're up against a motion for summary judgment deadline on November 16. Well, but you said it. I was about to ask the question. You're proceeding under the hurricane questionnaire in that question one, not the application form. I did assert the application form as an additional basis. Isn't that what the district court struck? That is. That's correct. And it's not before us as a basis. Well, it is—it wasn't—I respectfully disagree on the basis that this was de novo review and any of the arguments— If you struck the grounds, I don't see how that's before us, even if it's de novo. In other words, it wasn't a viable theory because you didn't assert it timely or whatever the ground was. I can't recall. Yeah. I'll just have to—I believe that if the—and I'll cite it—I'll cite the court if you'd like me to. I can—any of—if there's any issue that was actually presented to the district court and the parties had the opportunities to brief, I think you can affirm on that basis, Harbor Insurance Company v. Urban Construction, 990 F. 2nd, 195. Now, having said that, other than the breach of the application form, which to me isn't actually as relevant, because that's where you're going to be moored most of the time. There's no primary in the hurricane. And yes, you can navigate, just not too far south. So the hurricane plan to me is the issue, but when you say there are multiple bases to affirm beyond just the answer to question one, what are you thinking is your strongest basis? Well, they didn't—they say we will navigate to safe harbor. We will have it fully manned. It wasn't fully manned, okay? They say we will navigate— You mean the north, south, east, west— North, south, east, west. We will go. How far can we go? We will go 2,000 miles. But the simplest one is to deploy the anchor. I guess the question would be that all of that record was fully developed for the district court so we can reach it. We don't need to send it back. If the other bases in the hurricane questionnaire are, you know, clearly breached, in other words, it's established. It's absolutely. And there's no contrary evidence. In other words, even at the 12th scene— But is there any need for developing the record for— No. I really don't believe—no, Your Honor, respectfully, I don't believe that there's any need for additional development of those issues because there was deposition testimony. Look, the—Mr. Cruz himself testified that he knew that this—that the hurricane plan was incorporated, right? But the easiest one to me is that it wasn't navigated away. It wasn't taken to safe harbor, but they didn't even deploy the anchor. And so you've got to remember also the standard for a maritime—a breach of a maritime contract, maritime insurance, it doesn't even have to be—it doesn't even have to be causative of the loss. It can be collateral to the loss. If you breach a warranty, that's a breach that voids from inception. And so the hurricane clause itself, the hurricane plan itself says it is a warranty. And breach of a warranty, the contract itself, breach of a warranty, will void this from inception. That's also what New York law provides. But the policy and New York law are the same on that point, and that's what Judge Vance found. Let me see if I have anything—You know, Your Honor, I will point out that the whole reason that they—that they don't want to get to any extrinsic evidence is because all of the extrinsic evidence is very damning. And that's the same reason why they wouldn't answer our discovery initially, wouldn't tell us why it was in Pensacola and how long it had been in Pensacola. If the Court doesn't have any further questions, I'll be happy to step down. Thank you, Counsel. I want to start briefly by talking about some of the incorporation by reference issues. So, one, I want to direct the Court to the Valley Stream foreign cars case from 2016. That case literally states whether an extrinsic document is deemed to be incorporated by reference is a matter of law. Also want to direct the Court to the shark information case. That in particular is an insurance case under New York law, and there the Court stated that a document to be incorporated must be referred to and described in the instrument as issued, and there it was a policy, so the policy as issued, so as to identify the reference document beyond all reasonable doubt. And there that Court held that none of the instant policy's oblique references to an otherwise unidentified coverage form meets that exacting standard as a matter of law. And I also want to note, you know, it was clear in Great Lakes pleadings that they believe that the sort of application, the application is a full application and underwriting process. Here that's 160 pages of many, many months, and in other cases we could envision that could include thousands of pages of emails. Are all 160 pages in this record? I don't know if they're all in the record, Your Honor. I know the discovery responses in which they were asked. Please. Like bits and pieces. Right, so I believe that the discovery responses reveal the Bates labels that they identified of being 160 pages, but I don't know that the entirety was ever attached. But again, what would the limiting principle be? In other cases, we could imagine thousands of pages of emails, of notations, of phone calls, of things over many, many months. The application is the five page application form and under New York law, New York law demands and requires clarity and certainty for the benefit of both parties to have something identified within the policy itself. Very briefly, Judge Wilson, you are exactly right that what we're looking at on the second issue is the question as phrased in the hurricane questionnaire. We cannot be looking at the application form. Indeed, the district court struck any suggestion below. It was not pled in the complaint. It was not a basis for denying coverage. It was not a basis for moving for summary judgment. And we don't even see it briefed in their appeal as to why the district court made any alleged error in striking it. So that's obviously not the language that the court is looking at. We're simply construing the one sentence asking about the vessel's address. I also want to talk briefly, getting back on that point, the whole point is that Great Lakes originally urged that the vessel had to be moored in New Orleans the entirety of hurricane season. That's the interpretation that they advanced. The district court specifically rejected their interpretation and essentially went out of its way to give the insurance company every benefit of the doubt and supply an alternate construction. This alternate construction being that it has to be moored there the majority of the time. Not even Great Lakes advanced that. It embraces it now, and it wants the district court to affirm that. But they advocated for the entirety of hurricane season that it had to be moored there. Just before your time runs out, when he's saying, well, he litigated and both parties fully did and the record's complete as to there was no effort to evacuate in any direction. Sure, your honor, and very briefly on that, it's clear on the face of the hurricane plan submitted itself that it has narrow obligations only triggered during certain times and at certain geographic locations. Great Lakes accepted that plan as submitted. It didn't require any edits. It didn't make any modifications. It didn't refuse to issue coverage. And so on its face- That's a little uncomfortable, what you're saying, because it says you're supposed to be docked in Orleans Marina, and then it's very clear if you follow that requirement, when that storm comes, you've got to go. Your answer is, well, by not being docked there, we didn't have to evacuate anywhere. Even the storm came right at us? Is that the answer? Well, your honor, you also know that the plan refers to, and here's what we would do if we were in South Florida. Gray Group could not predict or did not try to predict in their hurricane plan every conceivable contingency and what it would do at every single possible location. And for example, it's- No, I think what it says is what you would generally do in the event of a hurricane and the boat being in the path of it. No, your honor- You're going to take the position that, well, if they're at Port St. Lucy, that's one thing. If it's in Tampa, it's another thing. If it's in Pensacola, it's another thing. And we're sort of released if it's not South Florida or New Orleans? Your honor, a warranty has got to be specific and clear. It cannot be extended by implication. And so we cannot read into the plan submitted and accepted by Great Lakes any additional things that are not in there. And it doesn't refer to any or undertake any obligations at different locations. But if the Great Lakes Group didn't say anything as part of the hurricane plan that, well, by the way, when we're not in these places, we don't have to do anything or we don't plan to do anything. Well, your honor, I'm responding to Judge Higginson's question as to why- But I've got the same discomfort he does. Well, I understand that you may have that discomfort, but a warranty has got to be specific and clear. And Great Lakes did not come back and ask for, well, what would you do in this contingency? Or how would you respond here? It accepted it as submitted, and on its face, it wasn't triggered here. And there are, on the actual- To be fair to him, I probably need to say time's up. You both have been superb in presenting this case to us, so we're grateful. But if either of my colleagues have any more questions? Nope, no. Thank you. Thank you, your honor. We'd ask this court to reverse. Thank you, that's very helpful.